IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

R.G., an individual; C.P., an individual )   CIVIL NO.  05-00566 JMS/LEK
by and through her next friend, A.W.; )
and J.D., an individual, )
                                      )
              Plaintiffs, )  ORDER GRANTING IN PART AND
                                      )  DENYING IN PART PLAINTIFFS'
     vs. )  MOTION FOR PRELIMINARY
                                      )  INJUNCTION
LILLIAN KOLLER, Director of the )
State of Hawai'i Department of Human )
Services, in her individual and official )
capacities; SHARON AGNEW, )
Director of the Office of Youth )
Services, in her individual and official )
capacities; KALEVE TUFONO- )
IOSEFA, Hawai'i Youth Correctional )
Facility Administrator, in her )
individual and official capacities; et al., )
                                      )
                                      )
             Defendants. )
_____

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

          Based on a 2004 investigation of the conditions at the Hawaii Youth

Correction Facility ("HYCF"), the United States Department of Justice ("DOJ")

found it "no exaggeration to describe HYCF as existing in a state of chaos."  After

reviewing the extensive pleadings filed by the parties and holding an evidentiary

hearing, the court finds that the DOJ finding is in fact not exaggerated.

Plaintiffs filed a motion for preliminary injunction seeking relief on their Due Process, Equal Protection, Establishment Clause and access to counsel claims. Plaintiffs ask the court to require defendants to refrain from harassing, abusing, discriminating against, or isolating plaintiffs based on their actual or perceived sexual orientation, gender identity or sex; to refrain from failing to protect plaintiffs from anti-lesbian, gay, bisexual, and transgender ("LGBT") peer harassment and abuse; to refrain from endorsing religion and engaging in religious indoctrination; and to refrain from obstructing plaintiffs' access to counsel. Plaintiffs also ask the court to direct defendants to retain a mutually agreed-upon corrections expert to guide development and implementation of necessary policies, procedures, and training at HYCF.

For the reasons stated herein, the court GRANTS the plaintiffs' motion for a preliminary injunction as to their Due Process claim and DENIES their motion for preliminary injunction as to their Establishment Clause and access to counsel claims. The court does not reach the plaintiffs' Equal Protection claim.

## I. BACKGROUND

HYCF is a secure juvenile correctional facility operated by the State of Hawaii Office of Youth Services ("OYS") and located in Kailua, Hawaii. OYS

is administratively associated with the Department of Human Services ("DHS").

Children who have been adjudicated delinquent in court may be committed to HYCF, the only such secured facility in the State of Hawaii. (Department of Justice Report ("DOJ Report") at 3, attached as Ex. B to the Declaration of Lois Perrin ("Perrin Decl.") .)[1]  HYCF is separated into three housing units:  the Secured Care Facility, which is comprised of three housing modules for boys; the Observation and Assessment Cottage ("O&A") for girls; and Ho'okipa Makai, a cottage for housing short-term boys.  (Declaration of Kaleve Tufono-Iosefa ("Tufono-Iosefa Decl.") ¶¶ 6-9.)

Plaintiffs are three teenagers who have been confined at the HYCF and who either identify as or are perceived to be LGBT.  Each of the plaintiffs has been confined at HYCF on more than one occasion.  Plaintiffs sought and received permission to proceed in this action using pseudonyms.

Plaintiff R.G. is a gay female who has been confined at HYCF on three occasions, for a total of approximately fifteen months.  (Declaration of R.G.

---

[1] The DOJ Report, admissible pursuant to Fed. R. Evid. 803(8), makes detailed factual findings regarding the conditions, policies, patterns and practices at HYCF as of October 2004. Those findings are the result of a thorough on-site investigation by neutral investigators from a government agency charged with the responsibility of seeking "remedies for any pattern or practice of conduct that violates the constitutional or federal statutory rights of children in juvenile justice institutions."  (DOJ Report at 1.)  Although the DOJ Report does not specifically address the issues now confronting the court – the treatment of LGBT wards at HYCF – the Report's findings are fully consistent with the findings contained in this order.

("R.G. Decl.") ¶¶ 2, 3, 7, 44-47.)  R.G. was first confined at HYCF from March 2004 to June 2004.  (R.G. Decl. ¶¶ 2, 3, 7, 44-47; Ex. G to Tufono-Iosefa Decl.)  R.G. was later returned to HYCF in August 2004 and remained there until August 2005.  (R.G. Decl. ¶ 7; Ex. G to Tufono-Iosefa Decl.).  R.G. was returned to HYCF a third time on September 8, 2005, after the Complaint in this action had been filed.  (R.G. Decl. ¶ 47.)

Plaintiff J.D. is a boy who was perceived to be gay while at HYCF.  HE has been confined at HYCF on two occasions, for a total of approximately six months.  J.D. was first confined at HYCF from July 27, 2004 until January 4, 2005.  (Ex. I to Tufono-Iosefa Decl.; Declaration of J.D. ("J.D. Decl.") ¶ 48.)  J.D. was returned to HYCF a second time on June 20, 2005 and remained there until July 5, 2005.  (J.D. Decl. ¶¶ 50, 53; Ex. I to Tufono-Iosefa Decl.)

Plaintiff C.P. is a transgender girl who was first confined at HYCF in February 2004.  (Declaration of C.P. ("C.P. Decl.") ¶ 10.)  C.P. remained at HYCF for most of 2004, excepting a short-lived foster placement in July of 2004.  (C.P. Decl. ¶¶ 11, 25.)  C.P. was placed in a foster program in December of 2004 and remained in foster placements until her return to HYCF in August of 2005, shortly before the Complaint was filed in this action.  (C.P. Decl. ¶¶ 51-52.)  C.P.'s confinement at HYCF totaled approximately eight months.

Defendants are, in their individual and official capacities:  Lillian Koller, Director of the DHS; Sharon Agnew, Director of OYS; and Kaleve Tufono-Iosefa, the HYCF Administrator ("Youth Facility Administrator" or "YFA").  The court refers to Koller, Agnew, and Tufono-Iosefa collectively as the "supervisory defendants."   The following Youth Corrections Officers ("YCOs") and Youth Corrections Supervisors ("YCSs") are also defendants:  YCO Cynthia Hubbell, YCS Phyllis Rosete, YCO Earlene Josiah, YCO Leila Holloway, YCO Henry Haina (also an HYCF Investigator), YCO Richard Kohler, former YCO and current YCS Mitch Simao, and YCO Michael Kim.

The defendants challenged the plaintiffs' standing to seek injunctive relief and the court heard argument on the standing issue on November 21, 2005.  At the November 21, 2005 hearing, the court ruled that the plaintiffs have standing; the court provides its reasoning for that decision in this order.  The court held an evidentiary hearing on the plaintiffs' motion on December 20-21, 2005.  At the hearing, both the plaintiffs and the government called witnesses and submitted declarations and exhibits.  The court bases its decision on all of the evidence submitted.

## II.  <u>LEGAL STANDARD</u>

In determining whether to grant a preliminary injunction, the courts in

the Ninth Circuit have traditionally considered the following factors:

> (1) the likelihood of plaintiff's success on the merits; (2) the possibility of plaintiff's suffering irreparable injury if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by the provision of preliminary relief.

*United States. v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir. 1987) (citation omitted).  "To obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in its favor."  *Id.*  These standards represent two extremes on a continuum in which "the required degree of irreparable harm increases as the probability of success decreases."  *Id.  See also Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) ("The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it.").  In addition, "advancement of the public interest" is one of the "traditional equitable criteria for granting a preliminary injunction." *Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir. 2001) (citation omitted).

On this motion, plaintiffs seek mandatory relief in addition to a prohibitory injunction, in the form of an order directing defendants to retain a mutually agreeable expert to guide them in reforming practices prohibited by the

court.  Plaintiffs contend that defendants lack the expertise necessary to prevent further violations of plaintiffs' rights; the plaintiffs also contend that the defendants lack the expertise necessary to select an expert to guide them in reforming their practices.  When a party "seeks mandatory preliminary relief that goes well beyond maintaining the status quo *pendente lite*, courts should be extremely cautious about issuing a preliminary injunction."  *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984).  Nevertheless, it is appropriate to issue a mandatory preliminary injunction when both "the facts and law clearly favor the moving party."  *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).

### III.  ANALYSIS

**A.    The Plaintiffs Have Satisfied the Article III Case or Controversy Requirement**

Article III, section 2 of the United States Constitution confines federal courts to deciding cases or controversies.  A plaintiff in a federal case must show that an actual controversy exists at all stages of the case.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997).  No case or controversy exists if a plaintiff lacks standing to make the claims asserted.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (stating that standing pertains to a federal court's subject matter jurisdiction).

1.    The Plaintiffs Have Standing

Standing is determined based on the facts at the time of filing of the complaint. *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001).  To have standing, a plaintiff must demonstrate:  (1) An injury in fact, that is, an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

The plaintiffs easily meet the second two standing requirements, causation and redressability.  Causation exists because the plaintiffs' injuries  – pervasive youth-on-youth and staff-on-youth harassment, discrimination, and abuse – allegedly result directly from HYCF's lack of adequate policies and procedures.  The defendants run a secured youth facility, and they control and bear ultimate responsibility for the environment they create at that facility.

It follows that the plaintiffs' injuries are likely to be redressed if the relief they seek is granted.  The plaintiffs seek an injunction preventing the defendants from engaging in unconstitutional conduct and requiring them to implement policies and procedures to ensure the plaintiffs' safety at HYCF. Because the conditions at HYCF caused the injury to the plaintiffs, enjoining

certain unconstitutional conduct and requiring defendants to implement policies and procedures to remedy those conditions will remedy the plaintiffs' injury.

The injury-in-fact requirement poses a more difficult question.  The plaintiffs seek injunctive relief, yet none of the plaintiffs was incarcerated at HYCF at the time the Complaint was filed.  A plaintiff seeking injunctive relief must show that he or she "can reasonably expect to encounter the same injury in the future."  13 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3531.2 (2d ed. 1984) (citing *Los Angeles v. Lyons*, 461 U.S. 95 (1983)).  *See also Armstrong v. Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001) ("[W]here, as here, a plaintiff seeks prospective injunctive relief, he must demonstrate 'that he is realistically threatened by a *repetition* of [the violation].'" (Quoting *Lyons*, 461 U.S. at 109.) (Final alteration in original.)); *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985) (plaintiff must show a "likelihood of similar injury in the future").

In order to satisfy the likelihood-of-repetition requirements, the plaintiffs must show:  (1) They reasonably expected, at the time of filing the Complaint, to be returned to HYCF; and (2) they reasonably expected, at the time of filing the Complaint, that if returned, they would be subjected to similar conditions.  Plaintiffs' showing suffices on both counts.

9

First, the plaintiffs have shown that, as of September 1, 2005 (when they filed the Complaint), each plaintiff was likely to return to HYCF. When the Complaint was filed, plaintiff R.G. was on parole from HYCF and was residing at the Sand Island Treatment Center. Prior to this placement, R.G. had been incarcerated at HYCF on two separate occasions. First, she spent three months at HYCF beginning in March 2004. She was then released to a treatment program at the Bobby Benson Center where she remained for a short time before running away. On August 4, 2004, R.G. was returned to HYCF. She spent over a year at the facility before being released on parole to the Sand Island Treatment Center on August 24, 2005. By September 29, 2005, when plaintiffs filed their Amended Complaint, R.G. had been incarcerated at HYCF for a third time after the Sand Island Treatment Center sent her back to HYCF on September 8, 2005.

As of the filing of the Complaint, J.D. had been incarcerated at HYCF on two separate occasions. First, J.D. was at HYCF from July 17, 2004 to January 4, 2005, when he was released to an independent living facility. He was returned to HYCF on June 20, 2005 for noncompliance with house rules. He then remained at HYCF until July 5, 2005, his eighteenth birthday. Shortly after leaving HYCF, J.D. went to family court for conduct that took place while he was a juvenile placed at HYCF. As a result, J.D. was placed on probation until his nineteenth

10

birthday.

When the Complaint was filed, C.P. had been incarcerated at HYCF on three separate occasions.  She was first incarcerated from February 2004 to July 2004, when she was released to a foster parent.  C.P. then returned to HYCF only a few weeks later after running away from her foster parent.  She then remained at HYCF until December 23, 2004 when she was released to another foster home. C.P. remained at this second home until August 10, 2005 when she returned to HYCF for one week before being released to live with her parents.

Each of the plaintiffs has been incarcerated at HYCF two to three times over a relatively short period of time.  Each had been released only to return to HYCF a short time later.  The plaintiffs' experiences thus indicate that, at the time the Complaint was filed, each plaintiff was likely to return to HYCF.  *See Demery v. Arpaio*, 378 F.3d 1020, 1027 (9th Cir. 2004) (affirming entry of a preliminary injunction based on determination that plaintiffs who had been arrested and incarcerated repeatedly were likely to be re-incarcerated and subjected to the same unconstitutional conditions), *cert. denied*, 125 S. Ct. 2961 (2005).

Moreover, statistics regarding parole revocation further confirm plaintiffs' reasonable expectation of return to HYCF as of the time of filing.

During the fiscal years 1996-1998, recidivism rates were as follows: 82.2 percent of released wards were rearrested; 57.3 percent of released wards were re-convicted; and 32.2 percent of released wards were re-confined at HYCF or a secure adult facility.  (Ex. 1 (Attorney General of Hawaii Report to OYS Feb. 2001 ("AG Report")) to Supplemental Perrin Declaration ("Supp. Perrin. Decl.") at 2; *see also* Declaration of Melvea Hardy ("Hardy Decl.") ¶¶ 7-9.)  YFA Tufono-Iosefa testified that a "conservative estimate" was that five youths were returned to HYCF from parole each month.  (Tr. I. at 192:20-24.)  With respect to wards who, like J.D., are on probation, the AG found that "[c]ommitments for probation revocation accounted for 27%" of first-time commitments to HYCF.  (Ex. 1 (AG Report) to Supp. Perrin  Decl. at 2); *see also* Declaration of Carolyn Brown ("Brown Decl.") ¶¶ 12-14.)  The likelihood that the plaintiffs would return to HYCF was therefore neither remote nor speculative.

The defendants argue that the plaintiffs do not have standing because they will only return to HYCF if they violate the law.  They cite *Lyons* and its progeny for the proposition that "standing is inappropriate where the future injury could be inflicted only in the event of future illegal conduct by the plaintiff." *Armstrong*, 275 F.3d at 865 (citing *Lyons*, 461 U.S. at 108).  The Ninth Circuit, however, has distinguished *Lyons* when the conduct that may trigger a future

violation is not unlawful.  In *Armstrong*, parolees had standing to challenge the conditions at parole revocation hearings because parolees could be subjected to unconstitutional conditions at the hearings on the mere suspicion that they had violated their parole.  *Armstrong*, 275 F.3d at 866; *see also Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041 (9th Cir. 1999) (holding that plaintiffs had standing to challenge stops by the United States Border Patrol because plaintiffs could be stopped without engaging in illegal conduct).

The plaintiffs in this case need not engage in illegal conduct to be returned to HYCF.  (Ex. 1 (AG Report) to Supp. Perrin Decl. at 13-15 (identifying legal behavior that can result in return to HYCF)); Declaration of Shauna Kamaka ("Kamaka Decl.") ¶¶ 5-9; Ex.1 to Kamaka Decl.; Hardy Decl. ¶¶ 8-9;  Ex. 3 to Brown Decl.; Brown Decl. ¶ 14.)  In fact, as demonstrated in the declaration of HYCF social worker Melvea Hardy, HYCF parolees can be returned not only for a violation of a condition of parole, but also at the request of a program where the ward is placed.  Hardy explains, as an example, that Sand Island Treatment residents can vote wards "off the island," resulting in a return to HYCF even though the ward committed no misconduct.  (Hardy Decl. ¶¶ 8-9.)

At the time of filing, plaintiffs C.P. and R.G. were on parole from HYCF and thus subject to return at any time, for any number of reasons, including

13

breaking curfew, not following program rules, not attending school on a regular basis, running away, or even quitting a job.  (Kamaka Decl. ¶ 9; Ex. 1 to Kamaka Decl.)  Plaintiff J.D. was on probation and subject to return to HYCF until his nineteenth birthday, in July 2006, for any violation of the terms of his probation. (*See* Brown Decl. ¶¶ 9-13; Exs. 1-3 to Brown Decl.)  Plaintiffs presented evidence that they could be returned to HYCF for mere suspicion of misconduct that falls well short of unlawful activity or even because of third-party conduct.  (Ex. 1 to Kamaka Decl.; Kamaka Decl. ¶¶ 5-9; Hardy Decl. ¶¶ 8-9.)  Indeed, R.G. alleges that she was returned from the Sand Island facility based on no misconduct of her own.  (R.G. Decl. ¶ 45.)

Second, the plaintiffs have shown that if they are returned to HYCF they will be subject to the same allegedly unconstitutional conditions that formed the basis of their Complaint.  The unconstitutional conditions at HYCF are alleged to be systemic.  Plaintiffs contend that HYCF lacks the policies and procedures necessary to prevent the pervasive harassment, discrimination, and abuse that takes place at the facility.  This is not a case, like *Lyons*, where the alleged conduct occurred as an isolated incident that was not the result of a policy or larger culture. Rather, plaintiffs' expectations that they would be subjected to unconstitutional conditions if returned to HYCF was objectively reasonable in light of the repeated

and persistent nature of the defendants' alleged unconstitutional conduct.  *See Armstrong*, 275 F.3d at 861 ("[W]here the defendants have repeatedly engaged in the injurious acts in the past, there is a sufficient possibility that they will engage in them in the near future to satisfy the 'realistic repetition' requirement.").

On this record, plaintiffs have demonstrated a reasonable expectation that they will be returned to HYCF and they have shown that, if returned, they are likely to be subjected to the same conditions alleged in the Complaint.

2.   <u>R.G.'s Claims Are Not Moot</u>[2]

After plaintiffs filed this motion, and while R.G. was briefly absent from her residential placement program in November 2005, defendants submitted testimony of HYCF's Parole Administrator, Devon Enesa, asserting Enesa's intention to avoid placing R.G. back in HYCF for a parole violation.  (Transcript of 11/21/05 hearing ("11/21 Tr.") at 15:9-16:20.)  However, defendants' asserted intentions do not moot R.G.'s claims.

Defendants have not met their "heavy burden" to submit evidence of events subsequent to filing that deprive R.G. of a continuing interest in conditions at HYCF.  *Demery*, 378 F.3d at 1025.  Enesa's statement of intent to recommend

---

[2]Defendants have not asserted that J.D.'s claims for injunctive relief are moot and there have been no changed circumstances since the filing of the Complaint that would suggest his claims have become moot.

that R.G. not be returned to HYCF neither establishes that she will not be sent back to HYCF nor gives her the relief she has requested.  Accordingly, her claims are not moot as the court still can grant her effectual relief.

Where an assertion of mootness is based on defendants' voluntary cessation of a challenged practice, the test for mootness is especially "stringent" and defendant bears a "formidable" burden.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189-90 (2000).  First, it must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* (citation omitted).  Second, the defendant must demonstrate that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (citations omitted).  "[T]he heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again *lies with the party asserting mootness*."  *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (internal quotation signals, brackets and citation omitted).

Under this standard, Enesa's recommendation that R.G. not be returned to HYCF for her November parole violation does not moot R.G.'s claims.  First, neither Enesa nor any of the defendants has the legal authority to detain R.G.

16

at a facility other than HYCF.  (11/21 Tr. at 15:18-16:20.)  That determination is

subject to the decisions of the prosecutor's office and the adult court.  (11/21 Tr. at

26:24-27:20.)  Should the state choose not to prosecute R.G. for her November

parole violation, R.G. could be returned to HYCF.  (11/21 Tr. at 27:16-20.)

Second, Enesa's recommendation that R.G. go to the adult detention facility

following her November parole violation was contingent on R.G. failing to return

to her program within a specified time period.  R.G. ultimately returned to her

program within the allotted time, rendering the recommendation irrelevant.

Finally, even if the court assumes that Enesa would make a similar

recommendation for R.G. if faced with a future parole violation, such a

recommendation would not insure that R.G. would not return to HYCF; in any

event, this assumption is too speculative for the court to conclude that the

defendants have shouldered their "heavy burden" of showing that R.G. cannot be

subjected to the same challenged conduct at HYCF.

     3.   <u>C.P.'s Claims Are Moot</u>

       C.P. was originally subject to HYCF's jurisdiction until her

eighteenth birthday.  As C.P. testified, she is no longer in custody of HYCF and,

because she turned eighteen in December 2005, she cannot be returned to HYCF.

(Transcript of 12/20/05 Hearing ("Tr. I") at 135:6-14.)  Because there is now no

realistic possibility that C.P. will be returned to HYCF, her claims have become moot.

The plaintiffs argue that C.P.'s claims are not moot because C.P. could be prosecuted for conduct that occurred while she was a minor and, as a result, HYCF's jurisdiction could be extended until her nineteenth birthday.  The plaintiffs point out that HYCF's jurisdiction over J.D. was extended until his nineteenth birthday under similar circumstances; shortly after J.D. was released from HYCF on his eighteenth birthday, he was prosecuted for conduct that occurred at HYCF while he was a minor and was placed on probation subject to return to HYCF as a result.  (J.D. Decl. ¶ 54; Brown Decl. ¶¶ 8-11.)  In contrast to J.D.'s case, however, several months have passed since C.P. was released to live with her parents and there is no indication that she will be prosecuted for any conduct that occurred while she was a minor.  Any possibility that C.P. might be prosecuted for an act that occurred while she was a minor, returned to the jurisdiction of HYCF, and ultimately incarcerated at HYCF is simply too remote at this point to support standing.  Therefore, C.P.'s claims have become moot.

Though C.P. no longer has standing, the court allowed her to testify at the hearing.  The plaintiffs allege systemic harassment of LGBT youth at HYCF, as well as differential treatment by staff and administrators.  Evidence regarding

C.P.'s experience at HYCF is therefore relevant to the remaining plaintiffs' claims insofar as it shows the extent and nature of the alleged abuse and harassment at HYCF.

4.      <u>The Defendants' Conduct Since the Filing of the Complaint has not Mooted the Plaintiffs' Claims</u>

HYCF has recently adopted a "Youth Rights" policy that provides that youth should not be discriminated against on the basis of "sexual orientation." (Ex. D. to Tufono-Iosefa Decl.)  Other than this simple statement, the current policies at HYCF remain silent with respect to the treatment and care of LGBT youth.  (Ex. D. to Tufono-Iosefa Decl.; Hardy Decl. ¶ 4; Declaration of Linda Hadley ("Hadley Decl.") ¶ 8; Supplemental Bidwell Declaration ("Supp. Bidwell Decl.") ¶ 8.)  There is no evidence, aside from the policies themselves, that HYCF has altered its treatment of LGBT wards.

Moreover, defendants' voluntary adoption of new policies does not moot plaintiffs' claims for injunctive relief.  Again, in cases of voluntary cessation, the defendant bears a "formidable" burden; it must be "*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur," *Friends of the Earth*, 528 U.S. at 189 (emphasis added), and the defendant must

demonstrate that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis*, 440 U.S. at 631 (citations omitted).  Defendants have made no such showing.

**B.      The Plaintiffs Are Entitled to a Preliminary Injunction**

      1.      <u>Findings of Fact</u>

        Unless otherwise indicated, the court finds that the followings facts have been proven to be more probably true than not true.  To the extent that any of these findings of fact are conclusions of law, they are to be so construed.

**Credibility Determinations**

1.      The findings set forth below are based in part on the court's preliminary credibility determinations.

2.      Defendants requested, and the court ordered, an evidentiary hearing on plaintiffs' motion to allow defendants to test the credibility of the plaintiffs.

3.      Defendants offered as evidence of bias relevant to plaintiffs' credibility a series of instances in which each plaintiff was disciplined by a defendant YCO for various infractions of HYCF rules.

4.      The court finds for purposes of this motion that R.G. was credible as to her

relevant testimony concerning abuse and harassment, including her testimony that she did not fabricate allegations in order to retaliate against defendants for discipline they imposed.[3]  This preliminary finding is based on:  (1) R.G.'s demeanor on the stand; (2) HYCF documents, which provide contemporaneous corroboration of other material details of R.G.'s testimony; (3) corroboration by other witnesses, who reported their personal observations to medical staff; and (4) the expert medical opinion of Dr. Bidwell that plaintiffs' contemporaneous and subsequent conduct is consistent with that of victims of traumatic harassment.  (Tr. I at 67:9-68:10.)  Moreover, R.G.'s stories are supported by the testimony of Dr. Bidwell that "[e]very single one" of the approximately twelve to fifteen LGBT wards who have been openly LGBT at HYCF have complained of similar harassment and abuse.  (Tr. I at 75:6-15.)

5.      While the court does have some concern with C.P.'s admission on the stand that she has made untruthful statements in order to get what she wants (Tr. I at 146:1-8), the court does not find that her allegations against HYCF were fabricated.  C.P. generally appeared honest and forthcoming on the stand. Moreover, her testimony was corroborated in the same manner that R.G.'s

---

[3]The court reviewed the deposition testimony of HYCF ward J.N. along with the objections filed by the parties.  The court finds that J.N.'s testimony does not undermine R.G.'s credibility.

21

testimony was corroborated:  through HYCF documents, other witnesses, Dr. Bidwell's observations, and her own contemporaneous grievances and statements made to medical staff.

6.      The court was also concerned by J.D.'s demeanor on the stand.  J.D. sometimes made faces and appeared flippant in his responses to questions.  At other times, however, J.D. seemed to consider the questions carefully and to provide thoughtful answers.

7.      On the whole, the court found J.D. credible as to his relevant testimony concerning abuse and harassment.  His testimony was corroborated in the same manner as R.G.'s and C.P.'s testimony and was not undermined by the defendants' line of questioning concerning bias.

8.      The defendants' theory – that the plaintiffs concocted this lawsuit in retaliation for HYCF punishing them for minor infractions – simply is not plausible with respect to any of the plaintiffs given the plaintiffs' own testimony, the corroboration by Dr. Bidwell, contemporaneous complaints by the plaintiffs, and even the testimony of YCO Alvaro.  Alvaro, in a conversational tone and without hesitation, testified about "butchie[4] things going on" at HYCF as if this

---

[4]The Oxford English Dictionary defines the word "butch" as "a lesbian of masculine appearance or behaviour."

term were a part of the everyday discourse at HYCF.

9.      The court is concerned about the credibility of Tufono-Iosefa.  Tufono-Iosefa declared under oath that HYCF's retained experts, Larry Miesner and Nelson Griffis, told her that it was appropriate to house male-to-female ("MTF") transgender youth with the boys, and that the norm in juvenile corrections is to house wards based on their genitalia.  (Tufono-Iosefa Decl. ¶¶ 10-11, 22.)  Both Miesner and Griffis submitted declarations flatly denying that they ever made such statements.  (Declaration of Larry Miesner ("Miesner Decl.") Decl. ¶¶ 8-10; Declaration of Nelson Griffis ("Griffis Decl.") ¶¶ 9-11.)  Although it is possible that an innocent misunderstanding may have occurred, both Griffis and Miesner declared that they would not have rendered such opinions.  Griffis and Miesner declared that, in their professional judgment, housing MTF transgender youth with male wards at HYCF is unsafe and inappropriate.  (Meisner Decl. ¶ 10, Griffis Decl. ¶ 11.)  At the evidentiary hearing, Tufono-Iosefa elaborated on her declaration testimony but did not explain her statement regarding the experts' opinions.

10.     Tufono-Iosefa testified that she neither directed nor had any knowledge of an April 21, 2005 Internal Communication Form (" ICF") that memorialized the results of a group meeting of the female wards concerning plaintiff R.G. and her

girlfriend T.R.  (Tr. I at 187:1-11.)  However, Tufono-Iosefa also testified that an ICF ordinarily would not bear her name unless she or her secretary created it, and that her secretary would not create the document absent Tufono-Iosefa's authorization.  (Tr. I 208:7-209:15.)

11.    Rebuttal witness Shauna Kamaka, an HYCF social worker, testified that she received the April 21, 2005 ICF from Tufono-Iosefa's secretary with instructions to review the ICF with R.G. and T.R.  Kamaka distributed the ICF to other staff members, who had requested documentation of the newly created rules from the April 20 meeting.[5] (Ex. A to R.G. Decl.; Transcript of 12/21/05 Hearing ("Tr. II") at 62:10-64:14 (Kamaka).)

12.    Though the court cannot conclude that Tufono-Iosefa authored the ICF or provided false testimony, the court is left with two possible explanations for the document, both of which are highly troubling:  (1) Tufono-Iosefa authored the ICF and lied under oath about doing so; or (2) conditions at HYCF are so chaotic that a document purportedly authored by the YFA containing new rules to be enforced against the wards can be circulated among staff and wards without Tufono-Iosefa's knowledge.

---

[5]There was inconsistency in the testimony regarding whether the meeting occurred on April 20 or April 21.  The ICA was dated April 21.

13.    The court finds that Dr. Bidwell, Linda Hadley, YCO Alvaro, and YCO

Rosete were all credible.

**Verbal Abuse By Staff and Other Wards Based on Wards' Actual or Perceived Sexual Orientation or Gender Identity is Pervasive at HYCF**

14.    The record before the court is replete with documents and testimonial

evidence demonstrating verbal harassment and abuse.

15.    Staff at HYCF, including YCOs Josiah and Hubbell, routinely referred to

R.G. as "butchie" or used other slurs based on sexual orientation or failure to

conform to gender stereotypes.  (R.G. Decl. at ¶ 10; Tr. I at 11:15-12:21 (R.G.);

Tr. II at 71:1-72:11 (Hadley); Joint Exs. 26 (Daily Report written by YCO stating

that R.G. "carries herself like she's the bull or something"); 29 (Daily Report

written by a YCO  noting that R.G. "has an identity problem. Too much thinking

that she is a boy."); 30 (YCO stating that "staff is getting tired of the butchie

action"); 32 (Daily Report written by a YCO, stating that R.G. is "playing the

bull"); 38 (Comment Report written by a YCO describing R.G.'s conduct as

"butchy action").)

16.    Defendant Hubbell regularly referred to R.G. and other female wards as

"fucking bitches" or "fucking cunts," and referred to female wards who identify as

gay, who express romantic feelings for other girls or who fail to conform to sex

stereotypes as "butchie."  Though Hubbell denies making these statements, the

court finds credible the testimony of the three rebuttal witnesses who heard

Hubbell using these slurs regularly.  (Tr. II at 71:1-72:11 (Hadley); 86:9-16

(R.G.); 88:5-88:16 (J.D.).)  For example, HYCF nurse practitioner Linda Hadley

credibly testified in rebuttal that Hubbell "on almost a daily basis" used phrases

such as "fucking little bitches," "butchies," and "fucking cunts."  (Tr. II at 71-72.)

17.     Defendant Tufono-Iosefa held a group meeting on April 20, 2005 focusing

on R.G.'s romantic relationship with another female ward, T.R.  (R.G. Decl. ¶¶ 27-

35; Tufono-Iosefa Decl. ¶ 37; Tr. I at 183:16-187:15)  During this meeting,

Tufono-Iosefa expressed her own views that being gay was "wrong" and

"disgusting" and required the other wards to develop rules and punishments for

R.G. and T.R. ( R.G. Decl. ¶¶ 27-35; Hadley Decl. ¶ 3; Tr. II at 74:6-76:1

(Hadley).)  Though Tufono-Iosefa denies making these statements (Tr. I at

199:4-18), Hadley credibly testified that two to four wards were upset after the

meeting and related to her (Hadley) that during the meeting, Tufono-Iosefa stated

that R.G.'s relationship with T.R. was "bad, and it was disgusting."  (Tr. II at 75-

76.)

18.     The casual use of the word "butchie" during courtroom testimony by

defendants' witness YCO Lawrence Alvaro reinforces plaintiffs' testimony that

the word is used commonly at HYCF.  During direct examination Alvaro testified, in a conversational manner and not quoting other wards or staff, that "[t]here was some talk, you know, like they was saying earlier, about butchie things going on . . . ."  (Tr. I at 218:12-17.)

19.    On a regular basis, other wards called J.D. names such as "wahine,"[6] "pussy," "gay fucker," "head," "dick sucker," "faggot," "mahu,"[7] "gay motherfucker," and "fucking gay bitch."  (J.D. Decl. ¶¶ 6, 18, 19, 24, 29; Joint Exs. 57, 61, 86.)

20.    YCO Haina, when asked by another ward if J.D. was gay, replied, in the presence of other wards, "Yes, [he] is a legal known fag."  (Declaration of Dr. Robert Bidwell ("Bidwell Decl.") ¶ 31; Joint Ex. 86.)  In his sworn declaration, defendant Haina did not deny making this statement.

21.    Wards at HYCF routinely called C.P. derogatory names, such as "fucking faggot" and "fucking mahu," in the presence of staff.  (C.P. Decl. ¶ 19; Tr. I at 131:15-18.)  Staff testified that such name-calling was a daily occurrence.  (Tr. I at 220:19-22 (Alvaro).)

22.    Certain YCOs and YCSs routinely called C.P. derogatory names based on

---

[6]"Wahine" means "woman" in Hawaiian.  Mary Kawena Pukui and Samual H. Elbert, Hawaiian Dictionary 377 (1987).

[7]"Mahu" means "[h]omosexual of either sex" in Hawaiian.  Hawaiian Dictionary 220.

her sexual orientation and/or gender identity.  Defendant YCS Mitch Simao

repeatedly referred to C.P. as "cupcake" and "fruitcake"  (C.P. Decl. ¶¶ 17, 20; Tr.

I at 131:3-8 (C.P.)), while YCO Tavako regularly referred to C.P. as "twinkle

toes" and "fairy."  (C.P. Decl. ¶ 18; Tr. I. at 131:17-20 (C.P.).)

23.     On one occasion, when female wards were braiding each other's hair,

Defendant YCS Simao told C.P. she could not have her hair up and that she was

not allowed to play with her hair "like the girls."  Various YCOs threatened to cut

off C.P.'s hair and to send her "over to the boys" side. (C.P. Decl. ¶¶ 16, 19, 21;

Tr. I at 130:1-18.)  Hadley, HYCF's nurse practitioner, "[h]eard from HYCF staff

that C.P. was being taunted and harassed by other staff and they were telling C.P.

that they were going to cut her hair and put her in with the boys."  (Hadley Decl.

¶ 4.)

24.     The record before the court establishes that verbal abuse and harassment of

LGBT wards is commonplace at HYCF.  (Tr. I at 64:9-15; 73:23-75:15 (Bidwell);

Tr. I at 220:19-22 (Alvaro) (stating that, although he did not recall hearing wards

call J.D. names like "faggot," "it's a daily thing").)  Such harassment continues

unabated.  (Tr. I. at 71:20-73:5 (Bidwell); Bidwell Decl. ¶ 16.)

25.     Dr. Robert Bidwell is the treating physician at HYCF.  He is also a

professor at the University of Hawaii Medical School, and is an expert in the field

of adolescent medicine, with special expertise in adolescent medicine in the juvenile correctional setting and in the treatment of LGBT adolescents.  Dr. Bidwell testified that the use by HYCF staff of terms like "faggot," "mahu," and "butchie" to refer to wards is a daily occurrence at HYCF and is symptomatic of a culture of abuse toward LGBT wards at HYCF.  (Tr. I at 73:23-75:5.)

**The Pervasive Verbal Abuse at HYCF Harmed the Plaintiffs**

26.     Being repeatedly referred to as a "butchie" (a word that R.G. had never heard prior to being confined at HYCF) made R.G. feel "ugly."  (Tr. I at 11:15-12:4 (R.G.).)  Dr. Bidwell testified that such name-calling directed at teenagers confined at HYCF is far more damaging than similar name-calling directed at adults.  (Tr. I at 69:21-70:17.)  Moreover, in the youth correctional setting at HYCF, the guards form something of an extended family for the youth, and, unlike youth in non-custodial settings, wards at HYCF cannot retreat to the safety of their home and family at the end of the day.  (Bidwell Decl. ¶ 17).  Indeed, wards typically call YCOs and YCSs "Aunty" or "Uncle."  (Bidwell Decl. ¶17.)  Thus, name-calling and other identity-based harassment based on actual or perceived sexual orientation or gender identity by guards at HYCF often is acutely damaging to wards who have been entrusted to the state's care by the family court.  (Tr. I at

68:24-70:7; Bidwell Decl. ¶¶ 16-17.)

27.   Dr. Bidwell testified that the harassment C.P. experienced was so severe that she threatened suicide because of what she was going through.  (Tr. I 65:21-24.)

28.   Dr. Bidwell also testified that all three of the plaintiffs exhibited behavior consistent with traumatic harassment.  (Tr. I 67:9-68:23.)

29.   Based on the record before the court, it is likely that plaintiffs will again be subjected to unrestrained verbal harassment and abuse by staff and other wards should they return to HYCF.

**Plaintiffs J.D. and C.P. Endured Physical and Sexual Assaults By Other Wards and Threats of Sexual Assaults Based on Their Actual or Perceived Sexual Orientation or Gender Identity**

30.   The record before the court contains extensive documentation of anti-LGBT sexual assaults, physical assaults and threats of sexual assault, including rape.

31.   J.D. suffered anti-gay sexual harassment and abuse by other wards at HYCF, including physical assaults and frequent threats of rape.  (J.D. Decl. ¶¶ 5, 17, 18, 19, 22; Exs. A, B to J.D. Decl.)

32.   Many wards threatened to physically and/or sexually assault J.D. on a regular basis and several assaulted him repeatedly by subjecting him to various forms of unwanted sexual touching. (Tr. I at 82:11-15.)  For example, after making

30

threats of rape and demanding that J.D. "give him head," J.D.'s roommate climbed on J.D.'s back while J.D. slept.  (J.D. Decl. ¶ 3.)  The incident made J.D. so frightened that he began to sleep sitting on the toilet to keep from being attacked from behind.  (J.D. Decl. ¶ 3.)

33.    Other wards also jumped on J.D. and pantomimed engaging in anal sex with him.  (Ex. A to J.D. Decl.)  They grabbed J.D.'s buttocks and rubbed suggestively against him, in one case while he was in the shower.  (J.D. Decl. ¶¶ 9, 19, 22; Exs. A, B to J.D. Decl.).  Wards placed their pubic hairs on J.D.'s head or body. Additionally, wards repeatedly told J.D. to "give them head" or "be their bitch," meaning have oral or anal sex with them.  (J.D. Decl. ¶¶ 3, 13, 23; Ex. B to J.D. Decl.)

34.    One ward repeatedly hung his testicles out of his shorts and asked J.D. to look at his "eight pack," put his testicles in J.D.'s hands, said to J.D. "suck on this [referring to his penis], don't use your teeth," and repeatedly sprinkled pubic hair on J.D.'s head and body.  (J.D. Decl. ¶¶ 17, 18; Ex. B to J.D. Decl.; Joint Exs. 51, 61, 62, 81.)  Another ward rubbed semen on J.D.'s face, exposed his penis and demanded that J.D. join him in the shower.  (J.D. Decl. ¶ 19.)

35.    When J.D. was returned to HYCF in June of 2005, the harassment and threats of assault continued because wards who had known J.D. from his previous

commitment told new wards that J.D. was gay.  (J.D. Decl. ¶¶ 47, 51.)

36.     Over HYCF's medical staff's objections, YFA Tufono-Iosefa transferred

C.P. in September 2004 from the girls' unit to the boys' unit when the girls were

temporarily sent to a facility in Utah.  (Tr. I at 180:8-16; 181:5-9.)  After C.P.'s

transfer, C.P. was subjected to escalating harassment and abuse from other wards,

including physical and sexual assaults, masturbation directed at her, and

threatening commands such as "suck my dick," "put this in your mouth and suck

on it," or "give me head," and threats of rape and assault.  (C.P. Decl. ¶¶ 32, 33,

34, 36, 40; Bidwell Decl. ¶ 46; Tr. I at 131:15-23; *compare* Joint Ex. 45 (10/22/04

C.P. letter to YFA, reporting only minor problems) *with* Joint Ex. 48 (11/17/04

C.P. letter to YFA reporting "hard time" from boys' teasing, name calling, and

"making trouble," and stating "I feel hurt and it makes me go insane and angry").)


37.     Some of the male wards touched C.P., pulled her hair, threw things at her,

told her to "give [them] head," or asked permission to rub her legs.  (C.P. Decl.

¶¶ 33, 36.)  Other male wards made comments like, "I want to feel your ass," and

"I want to fuck you," or asked her to show her breasts.  (C.P. Decl. ¶ 34.)  Other

male wards exposed their buttocks to her, pulled out their erect penises and

showed them to her, or started masturbating in front of her.  (C.P. Decl. ¶¶ 34-35.)

38.     Dr. Bidwell testified that C.P. told him repeatedly during her stays at HYCF of daily verbal harassment, some physical harassment, and sexual overtures.

39.     Defendants' own former juvenile corrections experts submitted declarations stating their expert opinion that they believed male to female transgender wards were "better off in O & A with the girls than anywhere else at HYCF and that the placement kept them physically and psychologically safe."  (Griffis Decl. at ¶¶ 8, 11; *see also* Miesner Decl. at ¶¶ 7, 10; Declaration of David Roush ("Roush Decl.") at ¶ 11.)

40.     Based on the record before the court, it is likely that plaintiffs will again be subjected to unrestrained physical and sexual assaults and threats of assault by other wards should they return to HYCF, and that such treatment will inflict significant harm on plaintiffs.

**The Supervisory Defendants Were Aware of the Pervasive Abuse and Harassment of LGBT Wards at HYCF, Yet They Took No Meaningful Steps to Remedy the Conditions**

41.     The record before the court contains substantial evidence that discrimination and verbal, sexual and physical harassment and abuse based on actual or perceived sexual orientation or gender identity are systemic problems at HYCF that have not been adequately addressed by the supervisory defendants.

42.     Many incidents of verbal abuse and harassment occurred in the presence of HYCF staff or were reported to staff, but the paucity of disciplinary records submitted by defendants indicates that, with respect to the vast majority of instances, staff took no action.  Even when staff documented incidents, disciplinary measures were either non-existent or were ineffective in stopping further harassment.  (Joint Exs. 66-67 (discipline for "fighting" issued to ward who J.D. said called him (J.D.) "mahu" and who staff saw spit on and hit J.D.); 79 (J.D. reported harassment and social worker talked to wards); 80 (YCO describes relentless harassment, stating she talked to wards and that "it stops for awhile, then it continues"); 81 (YCO describes continuing harassment, and the need to review footage from the surveillance camera system as "the only realistic option to curb this inappropriate activity").)

43.     Although other wards routinely called C.P. derogatory names in the presence of HYCF staff, and although C.P. complained about such harassment even when it occurred outside the presence of HYCF staff, the staff failed to discipline or stop the wards from calling her names.  (C.P. Decl. ¶ 19.)  C.P.'s account is corroborated by contemporaneous medical notes by her treating physician over a period of nearly a year that relate material details of the harassment suffered by C.P., including that certain YCOs routinely ignored such

harassment.  (*See* Joint Ex. 54 at (bates no. 1498, 10/6/04); (bates no. 1499, 11/29/04) and (bates nos. 1500-01, 1503, 8/15/05 to 8/17/05)).) [8]

44.    The testimony of defendants' witness YCO Rosete indicates an awareness on the part of HYCF staff that C.P. would be harassed and abused if she were transferred to the boys' side.   (Tr. II at 8:12-9:6.)

45.    Copies of complaints regarding C.P.'s transfer to the boys' side and her isolation in a holding cell were provided to Tufono-Iosefa and Agnew. (Bidwell Decl. ¶¶ 44, 49; Exs. C, E to Bidwell Decl.)  There is no evidence that defendants took any responsive action.  (Bidwell Decl. ¶¶ 45, 50.)

46.    On August 2, 2004, J.D. submitted a written grievance to Tufono-Iosefa describing in some detail the anti-gay verbal and physical harassment, sexual abuse, and threats of rape and other physical harm directed at him.  (Joint Ex. 61.) J.D.'s grievance specified that his roommate had threatened to rape him and had jumped on him "motioning having anal sex"; that other wards had "done the same"; that other wards had entered the showers while he was showering; that

---

[8] The court finds that statements made by wards to Dr. Bidwell, Nurse Hadley and other medical staff in the context of medical visits and for purposes of defining or explaining the patient's own mental or physical state, including, for instance, anxiety, depression, or other psychological or emotional upset, are admissible as statements for purposes of medical diagnosis.  Fed. R. Evid. 803(4).  *See also Swinton v. Potomac Corp.*, 270 F.3d 794, 807-08 (9th Cir. 2001) (plaintiff's description of harassment to his therapist admissible under Rule 803(4) as statement for purposes of medical diagnosis).

wards were sitting next to him "rubbing up on [him]"; and that wards put pubic hairs on his head.  (Joint Ex. 61.)  Tufono-Iosefa's response was to order that J.D. be placed in a single cell and to instruct YCOs "to pay extra attention on [J.D.] to prevent other wards from harassing him."  (Joint Ex. 61.)

47.    Despite the instruction to place J.D. in a single cell and to watch out for him, and although a few YCOs did try to stop the harassment, many YCOs continued to ignore harassment and refused to take action when J.D. reported it to them.  (Tr. I at 81:25-84:25; 85:8-86:9; Joint Ex. 61.)  The YCOs also failed to keep J.D. in a single cell, and on several occasions he was required to share a room with other wards.  (J.D. Decl. ¶¶ 11- 12.)

48.    On August 8, 2004, J.D. wrote a letter to YFA Tufono-Iosefa describing the continuing harassment and explaining that:

> Once again I am coming to you because this issue is not diminishing.  It is progressing i.e. threats, exposure, sexual harassment, frottage, and fondling, intimidation. This crap happens on a daily basis and I am not exaggerating.  For me this is too much shit for me and way too much stress. . . . I haven't even been here a month and I gotta deal with all this SHIT!  I am not threatening you but very soon I will either hurt myself or someone else and I know none of us want this to happen.

 (Joint Ex. 57.)

49.    Although Tufono-Iosefa received the letter on August 8th, it was not until

August 12th, four days later, that J.D. was referred for a mental health assessment,

leaving J.D. at risk of self-harm for four days without intervention.  (Joint Ex. 61.)

50.     Concerned about his emotional and physical well-being and safety, J.D.'s

public defender brought a petition for writ of habeas corpus in the First Judicial

District, State of Hawaii to have J.D. released from HYCF.  (Brown Decl. ¶ 6.)

The matter came on for hearing in August and September 2004, and resulted in a

written opinion issued by Judge Frances Wong on March 17, 2005.  (Brown Decl.

¶¶ 6-7; Bidwell Decl. ¶ 32; Ex. 1 to Supp. Bidwell Decl.)  That opinion found

"that the HYCF was aware of the abuse suffered by [J.D.] and did not, at that time,

take adequate or reasonable steps to address the problem."  (Ex. 1 to Supp.

Bidwell Decl. at 10-11.)  Judge Wong also informed the supervisory defendants of

the urgent need for "policies and operation procedures that are appropriate to the

treatment of [LGBT] youth, that set standards for the conduct of youth correctional

officers and other staff, and that provide on-going staff training and oversight" in

order to address the "systemic" problem of anti-LGBT harassment at HYCF.  (Ex.

1 to Supp. Bidwell Decl.  at 11.)  Notice of this decision was provided to the

supervisory defendants. (Ex. F to Bidwell Decl.)

51.     Defendants have been on notice of plaintiff R.G.'s claims of anti-LGBT

harassment, discrimination and abuse since at least February 2005 through the

filing of grievances.  The defendants also received notice through ICFs and correspondence from Dr. Bidwell to the supervisory defendants beginning in April of 2005.  (R.G. Decl. ¶¶ 15, 39-40;  Bidwell Decl. ¶¶ 54-55; Ex. F to Bidwell Decl.)  Dr. Bidwell received no response.  (Bidwell Decl. ¶ 57.)

52.     HYCF eventually initiated an investigation based on R.G.'s complaints of harassment sometime before the Complaint in this case was filed.  (Tufono-Iosefa Decl. ¶ 38.)  Nearly one year after R.G.'s initial complaint, that investigation has yet to be completed.  (Tufono-Iosefa Decl. ¶ 38; Tr. I at 201:22-202:7.)

53.     The numerous attempts by both Dr. Bidwell and Nurse Hadley to address the harassment and abuse perpetrated by HYCF staff and other wards against plaintiffs have been ignored by the supervisory defendants.  (Tr. I at 71:8-73:5 (Bidwell); 202:12-19 (Tufono-Iosefa); Bidwell Decl.  ¶¶ 15, 22, 24, 40-50, 54, 57; Supp. Bidwell Decl. ¶¶ 5-8; Hadley Decl. ¶ 5.)  Dr. Bidwell testified – and contemporaneous documents reflect – that the current administration was aware of the abuse and harassment of plaintiffs and other youth and that the abuse is systemic.  (Tr. I at 71:8-19; 73:23-75:15; 64:9-15; Exs. C, D, E, F to Bidwell Decl.)  In fact, Dr. Bidwell testified that he sent "many written communications" concerning harassment and abuse of a variety of wards, not just the plaintiffs, "over a period of a long time."  (Tr. I at 71.)

54.     Moreover, none of the supervisory defendants (Director Koller, Director Agnew or YFA Tufono-Iosefa) has ever responded in writing to any of the communications by medical staff regarding the anti-LGBT treatment of plaintiffs in this case – even after one of Dr. Bidwell's letters, copied to Koller and Agnew, referenced the family court's opinion concerning the systemic problem of anti-LGBT abuse and harassment at HYCF.  (Tr. I at 71:20-25 (Bidwell), 202:12-19 (Tufono-Iosefa); Agnew Decl. ¶ 11; Ex. F to Bidwell Decl.; Supp. Bidwell Decl. ¶¶ 3-5.)

55.     On August 16, 2004, when all three of the plaintiffs were confined at HYCF, DOJ launched a year-long investigation of conditions, policies, and practices at HYCF.  At the conclusion of DOJ's initial visit to HYCF on October 8, 2004, DOJ provided defendants with two extensive oral debriefings informing Agnew and Tufono-Iosefa of DOJ's preliminary findings.  (Ex. B to Perrin Decl. (DOJ Report) at 1-2.)

56.     On August 4, 2005, DOJ issued a report finding major constitutional deficiencies at HYCF, including failure to protect wards from self-harm, staff violence, youth-on-youth violence, excessive use of disciplinary isolation, lack of adequate supervision, and an inadequate grievance system.  (Ex. B to Perrin Decl. (DOJ Report) at 5–6.)

**Defendants Responded to Anti-LGBT Harassment by Isolating Plaintiffs**

57.     YFA Tufono-Iosefa, as a matter of practice, employed isolation as a means

of "protecting" certain LGBT wards, including C.P. and J.D., from conditions at

HYCF.  (Tufono-Iosefa Decl. ¶¶ 14, 25, 29, 32.)

58.     In response to grievances filed by J.D. in August of 2004 regarding the

continuous harassment he faced from other wards at HYCF, Tufono-Iosefa

directed that J.D. be placed in isolation for his "safety."  (J.D. Decl. ¶¶ 11–12, 32;

Joint Ex. 61; Tufono-Iosefa Decl. ¶ 29.)  J.D. was originally placed in isolation for

a medical evaluation.  Although he was cleared by medical staff on August 16,

(Joint Ex. 61), J.D. was kept in isolation "to provide [him] with a reasonably safe

environment" (Tufono-Iosefa Decl. at ¶ 32) until some time between August 23,

when medical records reflect he was still in a holding cell, and August 31, by

which point he had been released back to his module.  (Joint Ex. 85.)

59.     While J.D. was in the isolation cell, he was prevented from making any

phone calls or writing any letters.  He was allowed one hour of solo recreational

time and one shower per day, and was allowed only a Bible and another book

given to him by the nursing staff.  (J.D. Decl. ¶¶ 34-36.)

60.     The conditions in isolation were unbearable for J.D., causing him to cut up

his Remeron (sleep medication) into small pieces and take a little bit at a time so

he could sleep all day.  (J.D. Decl. ¶¶ 33-36.)

61.     J.D. was again placed in isolation after the August 2004 habeas hearing, at which Judge Wong requested that YFA Tufono-Iosefa be told of the family court's concerns about the harassment.  (Joint Ex. 76; (Tr. I 88:23-89:8 (J.D.).)  J.D. was returned to the module approximately one week later.  (Tr. I 88:23-89:8 (J.D.).)

62.     Similarly, in response to C.P.'s complaints of harassment, defendants first subjected her to social isolation by physically segregating her from the other wards in the module and later by sending her to a holding cell.  (C.P. Decl. ¶¶ 38-39, 53-57; Exs. A, B to C.P. Decl.; Joint Ex. 48.)  When not locked down, C.P. was instructed by YCOs not to have anything to do with any of the male wards – she was not supposed to sit with or near them, speak with them, look at them, or interact with them in any way.  (C.P. Decl. ¶ 38, Joint Ex. 48.)

63.     When C.P. returned to HYCF in August 2005, defendants held her in solitary confinement for six days, again, allegedly for her "protection."  (C.P. Decl. ¶ 55; Tufono-Iosefa Decl. ¶¶ 25-27.)  She was isolated in a holding cell under video surveillance for twenty-three hours a day, with nothing in her cell other than her pillow and a blanket.  (C.P. Decl. ¶ 55.)  She was allowed one hour a day to leave the cell for recreation and showering.  (C.P. Decl. ¶ 55.)  She was not permitted letters, writing instruments, radio, or television, nor was she allowed

to interact with any other wards.  (C.P. Decl. ¶ 55.)  C.P. reported to medical staff that she was "going crazy" in the holding cell.  (Joint Ex. 54 (bates no. 1503).)

64.     The expert evidence before the court regarding the use of isolation comes from juvenile corrections experts retained at one point by defendants.  (Tufono-Iosefa Decl. ¶¶ 10-11.)  Those experts uniformly conclude that long-term segregation or isolation of youth is inherently punitive, and that imposing such isolation as a form of protection is "not an acceptable correctional practice for juveniles." (Roush Decl. ¶¶ 12-13; *see also* Miesner Decl. ¶ 11; Griffis Decl. ¶ 12.)  Indeed, one of those experts characterized such treatment as "inexcusable." (Miesner Decl. ¶ 11.)  Another stated that HYCF may be the only juvenile facility in the country that employs this practice.  (Griffis Decl. ¶ 12.)

65.     Roush, Miesner and Griffis also confirm Dr. Bidwell's testimony and the testimony of plaintiffs J.D. and C.P. that social isolation is experienced as punishment (Roush Decl. ¶ 12), and that prolonged isolation can cause serious psychological consequences.  (Miesner Decl. ¶ 11; Roush Decl. ¶ 12; Griffis Decl. ¶ 12; Bidwell Decl. ¶ 26).  Due to its misuse by corrections staff, psychiatrists have recommended that the use of isolation in juvenile corrections be eliminated entirely.  (Roush Decl. ¶ 12.)  When isolation or segregation is used, it is accepted among professionals that it should be used "sparingly" and only in response to

serious behavioral infractions and for short periods of time "while the ward poses an imminent danger to others."  (Miesner Decl. ¶ 11; *see also* Roush Decl. ¶ 13; Griffis Decl. ¶ 12.)

66.     Based on the record regarding defendants' practice of using isolation as a form of protection, it is likely that defendants will isolate plaintiffs from other wards should they return to HYCF.

**HYCF Lacks Policies and Procedures to Ensure Safe Conditions of Confinement for HYCF Wards Who are or Who are Perceived to be LGBT**

67.     The DOJ Report found that the "most fundamental problem that plagues HYCF is the absence of policies or procedures to govern the facility."  (Ex. B to Perrin Decl. (DOJ Report) at 3.)

68.     The absence of adequate policies and procedures is compounded by defendants' failure to train the individuals expected to enforce them.  (Ex. B to Perrin Decl. (DOJ Report) at 4 ("Security staff . . . have received no training in over five years and have no rules to guide their decisions.").)  DOJ found that "staff and administrators were either unaware of the existence of any policies or procedures or were cognizant of their existence yet ignorant of their content." (Ex. B to Perrin Decl. (DOJ Report) at 4 n.4.)

69.     In fact, as of April 2004, none of the HYCF staff had received any formal training since the 1980s.  (Tr. I at 190:20-191:4 (Tufono-Iosefa).)

43

70.     On September 21, 2005, based on a directive issued by Agnew and while working on new policies, defendants re-adopted the same 1984 policies that DOJ condemned as "outdated and intended for an adult institution."  (Ex. B to Perrin Decl. (DOJ Report) at 4 n.4; Ex. D to Perrin Decl.)

71.     HYCF has adopted and implemented six new policies and procedures to govern HYCF, which became effective on October 24, 2005.  (Tufono-Iosefa Decl. ¶ 41; Ex. D to Tufono-Iosefa Decl.)[9]  These six policies took approximately one year to draft and adopt.  (Tr. I at 202:20-203:15 (Tufono-Iosefa).)

72.     This lengthy period is due in part to the fact that, although not required to do so under the governing collective bargaining agreements with HYCF staff, OYS and HYCF choose to follow past practices and engage in a lengthy and "grueling" process negotiating with the unions with respect to every new policy that is proposed at HYCF.  (Tr. I at 202:20-204:10 (Tufono-Iosefa).)

73.     Defendants concede that HYCF requires additional policies – including policies pertaining to youth safety – and that it will take one and a half to two years to complete the drafting and negotiation process for the remaining policies.  (Tr. I at 173:6-174:16.)

---

[9] One of the six new policies is apparently being rewritten due to problems with its implementation.  (Tr. I at 153:25-154:12.)

74.    HYCF does not have specific policies in place to protect LGBT youth – or any other vulnerable youth – from harm.  (Bidwell Decl. ¶¶ 13, 14.)  Agnew expressly admitted in a September 2005 television news interview that no policies were in place for gay and lesbian youth.  (Ex. H to Perrin Decl.)  After the instant lawsuit was initiated, HYCF adopted an October 14, 2005 policy that states, "[y]outh have the right not to be discriminated against because of race, sex, sexual orientation, language, and national origin[.]" (Ex. D to Tufono-Iosefa Decl.)

**HYCF Fails to Ensure Adequate Staffing, Training, Classification, and Supervision**

75.    Defendants' former experts performed a staffing study and training needs assessment of HYCF in June 2004, after which they advised Agnew and Tufono-Iosefa that HYCF "was in desperate need of more staff to protect the safety of wards" and that they should "use revised and expanded staff training to establish a juvenile corrections culture."  (Roush Decl. ¶¶ 7-8; *see also* Miesner Decl. ¶ 5 ("HYCF did not have sufficient staff, . . . the staff was not properly trained and . . . most of the staff did not have the proper attitudes or demeanor to work with troubled youth."); Griffis Decl. ¶ 5.)

76.    Griffis's declaration states that, based on his observations, HYCF "did not have a classification system for aggressive vs. vulnerable wards, and there were no policies, training or supervision, rendering the environment very unsafe for the

wards." (Griffis Decl. ¶ 5.)  Roush concluded his declaration by explaining that "it is the responsibility of the administration to create an environment that is physically and psychologically safe for the wards without violating the wards' rights." (Roush Decl. ¶ 13; *see also* Miesner Decl. ¶ 5; Griffis Decl. at ¶ 5.)

77.    In August 2005, DOJ suggested remedial measures necessary to bring staffing and supervision at HYCF into conformity with constitutional requirements, including:  (1) training existing staff so that they perform their duties adequately; (2) ensuring that there are sufficient staff to safely supervise youth; (3) providing staff with adequate training and equipment to supervise youth at risk of suicide; (4) providing staff with training on HYCF's suicide prevention policy; (5) developing and implementing adequate policies and procedures to ensure that youth are adequately protected from physical violence; and (6) developing and implementing adequate policies and procedures regarding the proper use of force by YCOs and other staff.  (Ex. B to Perrin Decl. (DOJ Report) at 26–28.)

78.    As of August 12, 2005, HYCF had not provided training on certain core issues such as supervision of youth, proper use of force, investigation techniques, and the identification and protection of vulnerable youth; HYCF did, however, have a plan in place for future staff training.  (Ex. C to Perrin Decl.)  HYCF social

worker Hardy testified that she and other staff received some training on use of force and HYCF's grievance procedure following the implementation of HYCF's youth rights policies in October 2005.  (Tr. I at 153:23-154:5.)  She also testified that staff received some questionable information regarding the new policy with respect to LGBT youth, including that placing a male-to-female transgender youth on the boys' side, where staff knew the ward would encounter abuse, would not constitute discrimination or abuse.  (Tr. I at 155:25-157:10.)

**HYCF Lacks a Functioning Grievance System**

79.    The DOJ Report concluded that "HYCF's grievance system is dysfunctional."  (Ex. B to Perrin Decl. (DOJ Report) at 20.)  The most significant legal deficiencies were "difficulty in filing claims and the common presence of intimidation and retaliation against those youth who are able and dare to do so."  (Ex. B to Perrin Decl. (DOJ Report) at 20.)  The DOJ found that the subjects of the complaints, usually the supervising YCO, often retaliated against the complainants.  (Ex. B to Perrin Decl. (DOJ Report) at 20.)

80.    Plaintiffs' experiences demonstrate the futility of HYCF's grievance system.  Some grievances take months to receive a response.  (Joint Ex. 9; Exs. A, B to C.P. Decl.)  HYCF social worker Hardy testified that, although she encourages wards to fill out grievance forms, the wards have told her that they "never receive

47

a reply." (Tr. I at 162:2.) When a grievance receives a response, it may not be treated confidentially, putting wards at risk for retaliation. (*See*, *e.g.*, Joint Ex. 86 (medical notes indicating J.D. complained that YCOs had shown other wards his grievance form).)

81.     Although HYCF recently adopted a new grievance system (Tufono-Iosefa Decl. ¶ 41; Ex. D to Tufono-Iosefa Decl.), the new system remains ineffective. Hardy testified that the new procedure works no better than the old procedure and is regarded by the wards as a "waste of time." (Tr. I at 161:14-162:6.)

82.     The absence of a meaningful grievance system at HYCF renders HYCF unable to address plaintiffs' complaints concerning the conditions of their confinement should they be returned to HYCF.

**Some HYCF Staff Members Promoted Certain Religious Ideas to Wards**

83.     Prior to June 2004, there was a practice at HYCF of allowing no personal items or reading materials in wards' cells other than a Bible. (R.G. Decl. ¶¶ 9, 10; C.P. Decl. ¶ 23; Ex. F to Perrin Decl.)

84.     This practice was formally prohibited by a June 21, 2004 order from Tufono-Iosefa. (Ex. F to Perrin Decl.)

85.     HYCF staff engaged in discussions of a religious nature with wards. (Tr. II at 18:21-19:12; 23:24-24:1 (Rosete).)

86.     R.G. testified that several HYCF staff members, including YCO Josiah and teacher Barbara Tanji, singled her out for proselytizing.  (R.G. Decl. ¶¶ 9-10, 14.)

87.     The record also establishes religious discussions between R.G. and Rosete while R.G. was confined at HYCF.  These discussions included accounts that the Bible says that being gay is "not of God," that the Bible states that "man should not lay with man," and that anyone who did so would be punished and go to hell.  (R.G. Decl. ¶¶ 4-5, 9; Tr. II at 10:6-17; 21:9-22:19 (Rosete).)

88.     It is also clear that R.G. initiated many of these conversations and that Rosete initiated at least some of them.  (Tr. I at 17:19-25 (R.G.); Tr. II at 19:5-12 (Rosete).)


**Plaintiffs Were Prevented From Speaking with Counsel on Two Occasions**

89.     Sometime in 2003,  HYCF began requiring written consent of parents and guardians to allow the wards to speak with the ACLU concerning the conditions, policies, and practices at HYCF.  (Ex. C to Tufono-Iosefa Decl.)

90.     In August 2005, R.G was denied permission to call her attorney at the ACLU.  (R.G. Decl. ¶ 43.)

91.     When C.P. was returned to HYCF in August, 2005, Tufono-Iosefa refused the ACLU's request to see C.P., and stated that all requests were to be referred to

the Attorney General's office.  (Perrin Decl. ¶ 13; C.P. Decl. ¶ 63.)

2.   Conclusions of Law

**a.   The plaintiffs are likely to succeed on their Due Process claim**

i.   The Fourteenth Amendment governs the constitutionality of conditions at HYCF

As an initial matter, the court must determine the constitutional standard that applies to the plaintiffs' claims regarding the conditions at HYCF. Whether the Eighth Amendment guarantee against cruel and unusual punishment or the "more protective" Fourteenth Amendment Due Process standard applies depends on the status of the wards confined at HYCF.  *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987).  The Eighth Amendment applies to those who have been convicted of crimes, while the Due Process standard applies to detainees who have not been convicted of crimes.  *Id.* (citing *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986) and *Whitley v. Albers*, 475 U.S. 312 (1986)).  In the instant case, wards of HYCF are adjudicated delinquent and have not been convicted of a crime.  Hawaii Revised Statute (HRS) § 571-1 (stating that a primary purpose of the Hawaii Family Courts is rehabilitation of juveniles and that "no adjudication by [Hawaii Family Courts] of the status of any child shall be deemed a conviction"); *State v. Rivera*, 92 Haw. 521, 993 P.2d 555 (2000)

50

(holding that a juvenile adjudication could not constitute a conviction for purposes of Hawaii's repeat offender provision). Therefore, the Due Process Clause provides the standard for analyzing the conditions of confinement at HYCF.[10]

In *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), the Supreme Court considered the Due Process rights of pretrial detainees (who, like the wards at HYCF, have not been convicted of crimes) challenging their conditions of confinement and held that conditions violate detainees' Due Process rights if they "amount to punishment." Subjecting detainees to unsafe conditions or isolation amounts to punishment when done either with the express intent to punish or without a legitimate purpose. *Id.* at 538-39. Even when a legitimate nonpunitive purpose is asserted, if the conditions imposed are "excessive" in relation to that nonpunitive purpose, including when substantial evidence demonstrates that officials' response to operational considerations is "exaggerated," a Due Process violation is established. *Id.* at 538, 540 n.23.

The court is mindful that it must review the record for constitutional violations, and that the court may not impose its own notion of the appropriate manner to operate HYCF. Thus, the court must determine whether a condition or

---

[10]*Gary H* upheld the application of the Due Process standard to analyze conditions at an Oregon juvenile detention facility where the district court concluded that the juvenile justice system was noncriminal and nonpenal in nature. *Id.* at 1432. This court likewise finds that Hawaii's juvenile justice system is noncriminal and nonpenal.

51

restriction that appears to be punishment is in fact "but an incident of a legitimate nonpunitive governmental objective." *Id.* at 539 n.20.

In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the Supreme Court held that a mentally disabled individual who was involuntarily committed to a state institution had a protected liberty interest in reasonably safe conditions of confinement and freedom from unreasonable bodily restraint.  457 U.S. at 315-16. The plaintiff in *Youngberg* was injured repeatedly by himself and by others; he alleged that defendants violated his rights to Due Process and freedom from cruel and unusual punishment when they "failed to institute appropriate preventive procedures" to keep him safe and instead restrained him for portions of each day, allegedly for his own safety and for the safety of others.  *Id.* at 310-11.  The Court reiterated that determining whether conditions violate Due Process requires courts "to balance 'the liberty of the individual' and 'the demands of an organized society.'"  *Id.* at 320 (quoting *Poe v. Ullman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)).  The Court elaborated on the analysis in *Bell*, explaining that whether state actors have "adequately . . . protected the rights of the involuntarily committed" depends on whether the decision reflects the judgment of qualified professionals or is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible

52

actually did not base the decision on such a judgment." *Id.* at 321-23.

Thus, "the Constitution only requires that the courts make certain that professional judgment in fact was exercised.  It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* at 321 (citation and quotation signals omitted).  However, the Supreme Court was careful to explain that such deference to state institutions is based on the recognition that they are run by appropriately qualified professionals. *Id.* at 323 n.30.  In other words, the determination that professional judgment has been exercised must be based on a finding that the challenged decision was made by "a person competent, whether by education, training or experience, to make the particular decision at issue" or a person "subject to the supervision of qualified persons." *Id.*

In the context of a failure to protect case, the Supreme Court has clarified that officials cannot be held liable for conditions of detention that are the result of mere negligence. *Davidson v. Cannon*, 474 U.S. 344, 348 (1986) ("[T]he protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials.").  Courts have typically applied the deliberate indifference standard to failure to protect claims where the direct source of the alleged harm is neither the conduct of the state defendant nor

53

the operation of an official policy or practice.  *See*, *e.g.*, *Redman v. County of San Diego*, 942 F.2d 1435 (9th Cir. 1991) (en banc).

The plaintiffs argue that the deliberate indifference standard does not apply to any of their Due Process claims and that the "amounts to punishment" standard applies instead.  While this *Bell* standard certainly applies to acknowledged policies at HYCF, it makes little sense when applied to the plaintiffs' claims that the facility failed to protect them from staff and ward harassment and abuse.  Although courts have not been entirely clear or consistent in the application of the Due Process Clause standards, two cases provide some helpful guidance.

*Hare v. City of Corinth, Mississippi*, 74 F.3d 633 (5th Cir. 1996) (en banc) reviewed the constitutional rights of a pretrial detainee.  After a lengthy review of Fifth Circuit cases, *Hare* concluded that the "*Bell* test retains vitality only when a pretrial detainee attacks general conditions, practices, rules, or restrictions of pretrial confinement.  When, by contrast, a pretrial detainee's claim is based on a jail official's episodic acts or omissions, the *Bell* test is inapplicable, and hence the proper inquiry is whether the official had a culpable state of mind in acting or failing to act."  *Id.* at 643.  *Hare* concluded that the deliberate indifference standard applied to a jail official's episodic acts or omissions.  *Id.*

54

*Hare* further clarified that the Bell analysis may apply to actions or omissions that are sufficiently "extended or pervasive" such that an intended condition or practice can be inferred.  *Id.* at 645.

In *Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003), the plaintiffs alleged unconstitutional conditions of confinement when a state hospital (charged with evaluating and treating mentally incapacitated criminal defendants) refused to accept the patients on a timely basis.  In reviewing the district court's injunction requiring the hospital to accept the patients within seven days of a court's finding of incapacity, the Ninth Circuit rejected the hospital's "claim that the deliberate indifference standard governs the Due Process rights of incapacitated . . . defendants."  *Id.* at 1120.  *See also Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004) (concluding that the deliberate indifference standard was inapplicable to a Due Process challenge to conditions of confinement).  Instead, the court applied a Due Process test consistent with *Bell* and *Youngberg*.  Thus, in conditions of confinement cases, the Ninth Circuit appears to be in agreement with *Hare*.

Reviewing the various claims made by plaintiffs, the court finds that the claim centering on isolation of wards is subject to the *Bell* test.  The defendants do not deny the practice of placing plaintiffs in isolation; they simply

claim that the practice is legitimate and thus constitutional.  This condition of

confinement claim thus fits well within the *Bell* framework.

Plaintiffs also allege that they suffered anti-LBGT harassment and

abuse; defendants deny the allegation, but argue that if the plaintiffs were harassed

and abused, HYCF staff were not the perpetrators and were not aware of the

abuse.  The question thus presented is whether the harm alleged is the result of a

pervasive, known practice – such that the requisite level of culpability can be

inferred and the *Bell* test applied without further inquiry into intent – or whether

the harm alleged is more episodic in nature, requiring the plaintiffs to prove

deliberate indifference.  Though the plaintiffs allege pervasive harassment at

HYCF, the court is reluctant to analyze the plaintiffs' claims on the assumption

that HYCF operates under a defacto policy of tolerating harassment and abuse of

wards from both staff and other wards.  The court concludes that the plaintiffs'

claim regarding harassment and abuse from guards and other wards is best

reviewed under the deliberate indifference standard applied to failure to protect

claims.  The court now turns to the plaintiffs' Due Process claims.

ii.     Defendants' use of isolation is inconsistent with
        professional standards and constitutes punishment

Though the use of isolation for "protection" violates HYCF's own

written policies (Tufono-Iosefa Decl. ¶ 42, Ex. E (wards have the right to "not be

isolated or segregated unless [their] behavior is in violation of HYCF rules and regulations.")), defendants admit that they use isolation as a means of "protecting" wards who are or are perceived to be LGBT, including C.P. and J.D., from abusive conditions at HYCF. (Defendants' Memorandum in Opposition at 27-28; Tufono-Iosefa Decl. ¶¶ 25-32.) The defendants contend that their decision to protect LGBT wards from harassment by isolating them from other wards was reasonable and non-punitive. After examining expert opinions and case law regarding the use of isolation on children, the court concludes that the defendants' use of isolation was not within the range of acceptable professional practices and constitutes punishment in violation of the plaintiffs' Due Process rights.[11]

The expert evidence before the court uniformly indicates that long-term segregation or isolation of youth is inherently punitive and is well outside the range of accepted professional practices. (Roush Decl. ¶¶ 12-13 (noting that social isolation is recognized as "inherently punishing" and that "[p]unishing a ward in order to protect that ward from the harmful actions of others is not an

---

[11]Even if the court assumes, despite the supervisory defendants' apparent endorsement of the use of isolation, that HYCF does not support the practice of protecting youth from harassment by isolating them, supervisory liability would still attach given the pervasive harassment of LGBT wards and lack of policies for protecting wards from harassment without resort to isolation. *See Redman*, 942 F.2d at 1446 ("Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.") (citations and internal quotation signals omitted).

acceptable correctional practice for juveniles"); Miesner Decl. ¶ 11 ("Prolonged

isolation or seclusion is punitive in nature and can cause serious psychological

consequences."); Griffis Decl. ¶ 12 ("Such segregation practice is not generally

accepted and falls outside of professional standards").)  Indeed, one expert opined

that HYCF may be the only juvenile facility in the country that employs this

practice.  (Griffis Decl. ¶ 12.)

Courts that have considered this issue have likewise concluded that

the use of isolation for juveniles, except in extreme circumstances, is a violation of

Due Process.  *See, e.g., H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1088 (11th Cir.

1986) ("Juveniles are even more susceptible to mental anguish than adult

convicts.")*; Santana v. Collazo*, 714 F.2d 1172 (1st Cir. 1983) (experts' testimony

on lack of therapeutic and disciplinary benefits from isolation sufficient to warrant

remand for further factual findings)*; Milonas v. Williams*, 691 F.2d 931, 942-43

(10th Cir. 1982) (affirming injunction against placing children in isolation for any

reason other than to contain violent behavior); *D.B. v. Tewksbury*, 545 F. Supp.

896, 905 (D. Or. 1982) (ruling that "[p]lacement of younger children in isolation

cells as a means of protecting them from older children" violates plaintiffs' Due

Process rights under the fourteenth amendment);  *Feliciano v. Barcelo,* 497 F.

Supp. 14, 35 (D.P.R. 1979) ("Solitary confinement of young adults is

58

unconstitutional."); *Lollis v. N.Y. State Dep't of Soc. Servs.*, 322 F. Supp. 473, 480 (S.D.N.Y. 1970) (concluding that plaintiff's solitary confinement was unconstitutional after considering extensive expert testimony stating that the extended use of isolation on children is "cruel and inhuman," and "counterproductive to the development of the child").

The likely perception by teenagers that isolation is imposed as punishment for being LGBT only compounds the harm.   (Bidwell Decl. ¶ 26; Ex. B to Declaration of Caitlin Ryan ("Ryan Decl.").)   The defendants do not dispute the expert findings regarding isolation; rather they merely assert that their purpose in isolating plaintiffs was protective rather than punitive.

Even if the defendants, including the supervisory defendants, did not intend to punish the plaintiffs, the court finds that the effects of isolation are not "but an incident of a legitimate non-punitive governmental objective." *Bell*, 441 U.S. at 539 n.20.  Defendants' practices are, at best, an excessive, and therefore unconstitutional, response to legitimate safety needs of the institution. *Id.* at 538. Consistently placing juvenile wards in isolation, not to impose discipline for violating rules, but simply to separate LGBT wards from their abusers, cannot be viewed in any reasonable light as advancing a legitimate nonpunitive governmental objective.  HYCF has attempted to remedy one harm with an

indefensible and unconstitutional solution.[12]

      iii.    **Defendants acted with deliberate indifference in allowing pervasive verbal, physical, and sexual abuse to persist at HYCF**

Wards at HYCF have a liberty interest in personal security and well-being that is protected by the substantive guarantees of the Due Process Clause of the Fourteenth Amendment. *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 579 (3d Cir. 2004) (citing *Youngberg*, 457 U.S. at 315-19); *Redman*, 942 F.2d at 1439. This interest encompasses a right to protection from psychological as well as physical abuse. *See K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) ("*Youngberg v. Romeo* made clear . . . that the Constitution requires the responsible state officials to take steps to prevent children in state institutions from deteriorating physically or psychologically.").

The record indicates that the conditions at HYCF are both physically and psychologically unsafe for the plaintiffs, such that the conditions amount to

---

[12]The court notes that it is *not* concluding that HYCF can never isolate a ward for his or her own protection. It is possible to imagine circumstances in which a threatened ward might need to be temporarily segregated while the staff attempts to control the situation. The court is not an expert in juvenile corrections and does not attempt to instruct HYCF on the appropriate response to an emergency situation. It is clear from the record, however, that HYCF has imposed extended periods of isolation and segregation on LGBT wards who experience harassment and abuse rather than addressing the climate of harassment and abuse that exists at HYCF. In other words, isolation and segregation of LGBT wards appears to be the customary response, not the exception, to harassment of these wards. This is not a constitutionally acceptable response.

punishment.  The plaintiffs do not complain of a few isolated incidents of name-calling or verbal harassment.  *See DeWalt v. Carter*, 224 F.3d 607, 612 & n.3 (7th Cir. 2000) (holding that "[s]tanding alone, simple verbal harassment does not . . . deprive a prisoner of a protected liberty interest," but noting that "racially derogatory language . . . can be quite important evidence of a constitutional violation"); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 138 (9th Cir. 1987) (holding same).  Rather, the plaintiffs complain of a relentless campaign of harassment based on their sexual orientation that included threats of violence, physical and sexual assault, imposed social isolation, and near constant use of homophobic slurs.  This level of harassment and abuse in a juvenile facility, where the wards have not been convicted of crimes and are committed to the care of the state, falls below the minimum level of care required by the Due Process Clause.  *See Youngberg*, 457 U.S. at 315-16 (recognizing a liberty interest in reasonably safe conditions of confinement).

The plaintiffs presented substantial evidence that the supervisory defendants were aware the of the climate of abuse at HYCF.  Findings of Fact ¶¶ 41-56.  Given their knowledge of the severity and the ongoing nature of the harassment and abuse plaintiffs faced from staff and other wards, the supervisory defendants' failure to take any minimally adequate remedial measures constitutes

61

deliberate indifference.

The court's conclusion that the defendants acted with deliberate indifference is based on the totality of the circumstances at HYCF.  Specifically, it is based on the court's findings that the defendants were aware that conditions at HYCF were unsafe for the plaintiffs and that, with this knowledge, defendants failed to maintain:  (1) policies and training necessary to protect LGBT youth; (2) adequate staffing and supervision; (3) a functioning grievance system; and (4) a classification system to protect vulnerable youth.  By highlighting these shortcomings, the court does not mean to suggest that the constitution requires particular policies or safeguards such as a grievance or classification system. Rather, it is the supervisory defendants' failure to adopt *any* professionally acceptable methods of maintaining order and safety at HYCF that constitutes deliberate indifference.

First, in light of ongoing abuse and harassment directed at LGBT youth at HYCF, the supervisory defendants' failure to adopt policies and procedures and to provide training regarding how to ensure the safety of LGBT wards supports a finding of deliberate indifference to plaintiffs' safety.  Most notable is the complete lack of training for staff about their obligations to refrain from harassment and discrimination, to intervene in ward-on-ward harassment,

and to investigate claims of harassment.

The Third Circuit recently considered a similar situation in *Luzerne*, 372 F.3d 572.  The plaintiff, a juvenile who was assaulted repeatedly by fellow wards in a detention facility, charged that the center's lack of policies to ensure youth safety and failure to train its staff on methods of identifying and protecting vulnerable youth violated his Due Process rights.  *Id.* at 575-76, 580.  The court reversed summary judgment for the defendants, holding that a reasonable jury could find the plaintiff's injuries were a foreseeable consequence of the center's lack of policies and procedures and failure to train, which were alleged to deviate substantially from accepted professional judgment.  *Id.* at 580-87.  Similarly, here, HYCF's lack of minimally adequate policies, procedures, and training to ensure ward safety resulted in harassment and abuse by staff and other wards so severe that it caused each of the plaintiffs to contemplate self-harm or suicide and one of the plaintiffs to engage in self-mutilation and attempt suicide.

Second, the supervisory defendants' failure to ensure adequate staffing and supervision at HYCF supports a finding of deliberate indifference.  As the DOJ Report concluded, "the lack of supervision of youth is [a] contributing factor" to unconstitutionally hazardous conditions at HYCF.  *See also Luzerne*, 372 F.3d at 581 (holding that a municipality may be liable for inadequate staffing

63

and supervision where "the causal link between the alleged policy or custom and the constitutional injury is not too tenuous" (citation and internal quotation signals omitted)).  Testimony from plaintiffs J.D. and C.P. that they frequently experienced ward-on-ward harassment when YCOs were not paying attention or were absent is consistent with the DOJ finding that defendants have "employed an insufficient number of staff at HYCF to monitor youth, and the staff that are employed there have no training in adequate monitoring procedures.  As a result, youth are frequently able to exploit the gaps in supervision and harm other juveniles."  (Ex. B to Perrin Decl. (DOJ Report) at 16.)  Given the obvious relationship between staffing levels and safety in a custodial setting, defendants' chronically inadequate staffing supports a finding of deliberate indifference. *Luzerne*, 372 F.3d at 581.

Third, HYCF's inadequate grievance systems supports a finding of deliberate indifference.  The DOJ Report found that "[t]he most significant legal deficiencies with the grievance system at HYCF are the difficulty in filing claims and the common presence of intimidation and retaliation against those youth who are able and dare to do so."  (Ex. B to  Perrin Decl. (DOJ Report) at 20-21 (former administrator conceded "that he simply could not complete investigations" due to resistance and sick outs by YCOs).)  Nothing in the evidence before the court

64

suggests that these deficiencies have been corrected by HYCF.

HYCF's former grievance policy, which was in place until after plaintiffs' Motion for Preliminary Injunction was filed, was ineffective in addressing plaintiffs' complaints.  Investigations concerning alleged mistreatment could take months to complete, grievances were not always treated confidentially, and wards regarded the process as a waste of time.  Findings of Fact ¶¶ 79-82. Although defendants have adopted a new grievance procedure after the plaintiffs filed their motion, testimony by Nurse Hadley demonstrates that this new system is not working.

In *Luzerne*, the court concluded that evidence of an inadequate policy for reviewing and acting on incident reports could support a finding that "the Center disregarded an obvious consequence of its action, namely, that residents of the Center could be at risk if information gleaned from the incident reports was not reviewed and acted upon."  372 F.3d at 583.  Likewise, here, defendants' failure to establish an adequate policy for reviewing and acting upon grievances and incident reports contributes directly to the unsafe environment at HYCF.

Finally, the defendants' admitted lack of a classification system for protecting vulnerable wards supports a finding of deliberate indifference.  Juvenile corrections experts Roush, Miesner and Griffis provided unrebutted testimony

65

establishing that the absence of a classification system to protect vulnerable wards

from aggressive wards, combined with the absence of policies, training and

supervision, makes the environment at HYCF unsafe.

Similarly, DOJ found that HYCF's frequent failure to protect youth

from assaults by other wards can be attributed in part "to the absence of a

classification criteria for housing youth. . . .  [S]taff place aggressive youth with

vulnerable youth regardless of the risk of harm."  (Ex. B to Perrin Decl. (DOJ

Report) at 16.)  A sound classification system is necessary to provide incarcerated

juveniles with reasonably safe conditions, including the right "to reasonable

protection from the aggression of others, whether 'others' be juveniles or staff."

*Alexander S. v. Boyd*, 876 F. Supp. 773, 798 (D.S.C. 1995); *see also Redman*,

942 F.2d at 1440 n.7; (Ex. K to Perrin Decl. (AG Report); ( Ex. J to Perrin Decl. at

6 (report of court-appointed expert regarding conditions at California Youth

Authority noting the "growing professional consensus that effective classification

systems are central to the safe and efficient operation of correctional systems").)

Defendants' failure to classify wards and practice of placing aggressive youth with

vulnerable youth, including placing J.D. and C.P. with aggressive boys, has

resulted in and continues to threaten repeated physical and sexual assaults and

pervasive verbal harassment.  Based on the undisputed expert testimony and legal

precedent before the court, the decision not to employ a classification system supports a finding of deliberate indifference.

### b.     The court does not reach the plaintiffs' Equal Protection claim

The plaintiffs seek the same injunctive relief pursuant to the Equal Protection Clause that they seek in their Due Process claims.  Because the court concludes that HYCF violated the plaintiffs' rights under the Due Process Clause and orders injunctive relief to remedy the violation, the court need not reach the plaintiffs' Equal Protection claim.

### c.     The plaintiffs are not likely to succeed on their Establishment Clause claim

Modern Establishment Clause jurisprudence centers on three tests. One is the three-prong test from *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), under which a "statute must have a secular legislative purpose[,] . . . its principal or primary effect must be one that neither advances nor inhibits religion, [and it] . . . must not foster an excessive government entanglement with religion."  (Citations and internal quotation signals omitted.)  Another is the endorsement test from *County of Allegheny v. ACLU*, 492 U.S. 573 (1989).  Under the endorsement test, a state institution such as HYCF violates the Establishment Clause if it "take[s] a

position on questions of religious belief" or "convey[s] a message that a religion or particular religious belief is favored or preferred." *Id*. at 593-94 (citation, internal quotation signals, and emphasis omitted).  The third is the coercion test from *Lee v. Weisman*, 505 U.S. 577, 587 (1992), which provides that "government may not coerce anyone to support or participate in religion or its exercise."  Relief is proper upon a finding that defendants' actions violate any of the three tests. *Newdow v. United States Cong.*, 328 F.3d 466, 487 (9th Cir. 2003), rev'd on other grounds, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004). Establishment Clause jurisprudence is especially protective of youth, recognizing that they are particularly susceptible to religious coercion.  *See Lee v. Weisman*, 505 U.S. 577, 592-93 (1992).

     Plaintiffs essentially make two claims based on the endorsement test. First, plaintiffs claim that the defendants endorsed religion by enforcing a policy of allowing the wards to keep only Bibles and no other personal belongings or books in their cells.  Second, the plaintiffs allege that certain HYCF staff members promoted religion, often discussing religious teachings and quoting from the Bible, and that HYCF ratified the conduct of these staff members.

     The plaintiffs' first claim fails because the plaintiffs cannot show that HYCF adheres to a Bibles-only practice.  Though there is some evidence that

HYCF once restricted wards' personal belongings to Bibles, Tufono-Iosefa issued an ICF on June 21, 2004 officially terminating this practice.  Plaintiffs contend that this practice has continued; however, they have produced scant evidence to support this contention.  Even if some wards were denied personal belongings other than Bibles on isolated occasions, such instances were contrary to HYCF policy and were not part of a pervasive practice.

Plaintiffs' allegations regarding staff promotion of religion present a closer case.  It is clear from the record that several staff members engaged in discussions about the Bible with some wards.  To support a claim under the Establishment Clause, however, the plaintiffs must show more than that individual staff members endorsed religion; they must demonstrate that the staff members' promotion of religion to the plaintiffs constitutes *government endorsement* of religion. Though the plaintiffs must establish government action to succeed on their claim, "[f]or the purpose of an Establishment Clause violation, a state policy need not be formal, written, or approved by an official body to qualify as state sponsorship of religion."  *Canell v. Lighter*, 143 F.3d 1210, 1214 (9th Cir. 1998).  Thus, the court must determine whether the conduct of certain staff members is "sufficiently imbued with the state's authority to constitute state endorsement of religion."  *Id.*

In *Canell v. Lightner*, the Ninth Circuit analyzed whether a corrections officer's promotion of religion to an inmate violated the Establishment Clause. The challenged conduct in *Canell* consisted of isolated incidents of singing Christian songs, belittling other religions, and mock-preaching by one guard on a total of eighteen days. *Id.* The court found no Establishment Clause violation because there was no evidence that the officer was acting pursuant to an official policy or custom of the facility and, in fact, there was evidence that the facility trained officers *not* to preach or proselytize to inmates. *Id.* at 1213-14. The plaintiff in *Canell* did not allege that the officer had the authority to make policy at the facility or that the officer's actions were in some way ratified by the facility. *Id.* at 1214. Moreover, as soon the plaintiff complained about the offending behavior, the officer was transferred and the conduct ceased. *Id.*

The plaintiffs here present a stronger case. First, R.G. testified that several HYCF staff members, including YCOs Josiah and Rosete and teacher Barbara Tanji, singled her out for religious teachings. (R.G. Decl. ¶¶ 4-5, 9-10, 14.) R.G.'s testimony is supported by a May 17, 2005 letter from Dr. Bidwell to Tufono-Iosefa, which was copied to defendants Agnew and Koller. (Ex F to Bidwell Decl.) That letter reported the salient details of some of the religious proselytizing alleged by R.G. YCOs Josiah and Rosete submitted declarations

generally denying aspects of R.G.'s account.  Although Rosete claimed in her declaration that R.G. initiated conversations about the Bible, Rosete's testimony at the evidentiary hearing revealed that Rosete also initiated conversations about the Bible with R.G.  (Tr. II at 19:5-12 (Rosete).)  Josiah has not testified, and Tanji has neither testified nor provided a declaration.

Though there is evidence that at least some staff members at HYCF endorsed religion to the plaintiffs, there is insufficient evidence at this stage for the court to make a preliminary finding of state endorsement of religion.  The plaintiffs have offered no evidence that the staff members in question were acting pursuant to an explicit policy, that they had the power to make policy at HYCF, or that HYCF in any way ratified their statements to the plaintiffs.  Moreover, plaintiffs have not produced evidence of a sufficiently pervasive practice such that the court can infer that HYCF condoned the practice of staff promoting religion to wards.  HYCF's failure to take prompt action on Dr. Bidwell's letter suggesting religious endorsement by staff members, while troubling, does not by itself establish that HYCF ratified the conduct the of the staff in question.

To be clear, the court is concerned by the evidence that members of the HYCF staff have promoted certain religious teachings to the plaintiffs.  Based on the limited facts in the current record, however, the court concludes that

71

plaintiffs are unlikely to succeed on their claim that the staff members' conduct

amounts to government endorsement of religion.

### d.    The plaintiffs are not likely to succeed on their access to counsel claim

The right of access to the courts is protected by Due Process and

Equal Protection Clauses, *see Ex parte Hull*, 312 U.S. 546, 549 (1941), *Murray v.

Giarratano*, 492 U.S. 1, 11 n.6 (1989) and requires that prisoners be afforded "a

reasonably adequate opportunity to present claimed violations of fundamental

constitutional rights to the courts." *Bounds v. Smith*, 430 U.S. 817, 825 (1977),

overruled in part on other grounds, *Lewis v. Casey*, 518 U.S. 343, 354 (1996).

Prison officials must both eliminate undue barriers to inmate access and "shoulder

affirmative obligations to assure all prisoners meaningful access to the courts."

*Bounds*, 430 U.S. at 824.  For juveniles, courts have held that meaningful access

requires access to counsel to allow children to assert violations of their civil rights

related to their incarceration.  *See John L. v. Adams*, 969 F.2d 288, 230 (6th Cir.

1992) ("[W]e hold that incarcerated juveniles do have a constitutional right of

access to the courts, and that in order to make this right meaningful the State must

provide the juveniles with access to an attorney.").

The plaintiffs submitted uncontroverted evidence that HYCF recently

adopted a policy requiring parental consent to allow wards to speak with the

ACLU about the conditions of their confinement.   (Supp. Perrin Decl. ¶¶ 22, 38; Alston Decl. ¶¶ 6, 8, Ex. 6; Ex. C to Tufono-Iosefa Decl.)  There is also evidence that HYCF has failed to adopt a policy and to train staff regarding a system for ensuring wards' rights to authorized legal calls and legal visits with civil counsel. (Hardy Decl. ¶¶ 10-11.)

The court need not determine whether HYCF has implemented adequate policies to ensure a right to counsel, however, because the plaintiffs have not submitted evidence indicating that they were denied *their* right to counsel. The only plaintiff with standing in this case who alleges any facts regarding right to counsel is R.G.  She claims she was denied permission to contact her retained attorney at the ACLU on one occasion.  (R.G. Decl. ¶ 43.)  R.G. was represented by the ACLU in preparation for the instant lawsuit while she was incarcerated at HYCF;  R.G. therefore had access to counsel to bring her civil rights claim, as constitutionally required, and there is no evidence that HYCF interfered with her relationship with counsel.  Even if the court credits R.G.'s statement that she was denied the right to call her attorney on one occasion, this incident does not rise to the level of a constitutional violation.

> **e.    The plaintiffs have demonstrated a possibility of irreparable harm and the balance of hardships and the public interest weight in favor of granting preliminary injunctive relief**

73

Because the plaintiffs have demonstrated a strong likelihood of success on their Due Process claim, they need only show a *possibility* of irreparable harm in order to be entitled to preliminary injunctive relief. *Warsoldier v. Warsoldier*, 418 F.3d 989, 993-94 (9th Cir. 2005).  And as the Ninth Circuit has stated, "'[A]n alleged constitutional infringement will often alone constitute irreparable harm.'"  *Associated Gen. Contractors of Cal.. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (quoting *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th 1984)).

Moreover, the balance of hardships here is clear.  On the one hand, plaintiffs will suffer serious harm if they are again subjected to harassment and abuse at HYCF.  On the other hand, defendants may be compelled to take to take appropriate measures to ensure ward safety and to refrain from punitive isolation. While requiring defendants to adopt polices, procedures, and training so as to provide wards with a reasonably safe environment at HYCF may impose some administrative inconvenience, any burden on the defendants is minimal when viewed in light of defendants' legal responsibility to provide a safe environment, not only to the plaintiffs, but to all of the State's wards that are entrusted to HYCF's custody and care.  Thus, the balance of hardships tips decidedly in plaintiffs' favor.

Finally, protection of constitutional rights is a compelling public interest, *see United States v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees[.]"), and "weighs heavily in the balancing of harms, for the protection of those rights is not merely a benefit to plaintiff but to all citizens." *Int'l Soc'y for Krishna Consciousness v. Kearnes*, 454 F. Supp. 116, 125 (E.D. Cal. 1978) (discussing First Amendment rights).  The public interest is best served by issuing injunctive relief to the plaintiffs.

## IV.  CONCLUSION

For the reasons stated herein, the court GRANTS the plaintiffs' motion for preliminary injunction as to plaintiffs' Due Process claim, DENIES the motion as to plaintiffs' Establishment Clause and access to counsel claims, and does not reach plaintiffs' Equal Protection claim.

On January 27, 2006 the court held a status conference and heard from State of Hawaii Attorney General Mark Bennett regarding HYCF's ongoing negotiations with DOJ.  Mr. Bennett represented that HYCF is close to reaching an agreement with DOJ and requested that the court delay issuing an injunction in

this matter until an agreement has been finalized.  To the extent possible, the court

seeks to avoid subjecting HYCF to conflicting obligations under the injunction in

\\

\\

\\

\\

\\

\\

\\

\\

this case and the DOJ agreement.  Therefore the court finds that a short delay in

issuing an injunction is warranted so that the court may consider HYCF's

obligations under the DOJ agreement when crafting a remedy.  The court has

instructed the parties to attempt to reach an agreement on injunction language

consistent with court's findings in this order and any broader remedies negotiated

with DOJ.

　　　　IT IS SO ORDERED.

　　　　DATED:  Honolulu, Hawaii, February 7, 2006.



J. Michael Seabright
United States District Judge

*R.G. et al. v. Koller et al.*, Civ. No. 05-00566 JMS/LEK, Order Granting in Part and Denying in Part Plaintiffs' Motion for Preliminary Injunction.